## 58450. GLENN v. TRUST COMPANY OF COLUMBUS.

CARLEY, Judge.

The Trust Company filed a petition for a writ of possession to recover an automobile from Glenn which had been pledged as security for a loan made to him by the Trust Company. Glenn filed an answer denying Trust Company's right to relief and a counterclaim alleging violations of certain provisions of the Truth-in-Lending Act (15 USCA § 1601 et seq.) and seeking the statutory recovery of double the finance charge and attorney fees. A motion for summary judgment filed by Glenn was denied by the trial judge who determined that an issue of fact existed. At the trial of the case before the court without the intervention of a jury, the parties stipulated that the lender was entitled to a writ of possession (see *First Citizens Bank &c. Co. v. Owings,* 151 Ga. App. 389) and the trial court found for the Trust Company, ruling that "the contract is very clear and does not violate the Federal Truth-In-Lending provisions of the Federal Consumer Credit Protection Act." Glenn appeals from that order.

1. The first alleged violation of the Truth-in-Lending provisions pertains to the lender's security interest in the automobile under the note, which recites in this regard: "To secure the obligation of the undersigned to pay this note, and all other obligations of undersigned to Holder, its successors and assigns, however created, arising or evidenced, whether direct or indirect, absolute or contingent, or now or hereafter existing, or due or to become due (hereafter called 'Liabilities'), undersigned conveys and hereby grants to Holder security title to and a security interest in the following property and *all accessories, parts and equipment now or hereafter affixed thereto or used in connection therewith* (hereafter collectively called 'Goods'). . . " (Emphasis supplied.)

Regulation Z of the Federal Reserve Board, as promulgated to effectuate the Federal Truth-in-Lending Act (12 CFR § 226.8 (b) (5)), requires that notice that after-acquired property is subject to a security interest "be clearly set forth in conjunction with the description or

identification of the type of security interest held, retained or acquired." However, as pointed out by the Fifth Circuit Court of Appeals, the Uniform Commercial Code as adopted in Georgia (Code Ann. § 109A-9—204) governs the determination whether after-acquired property is subject to a lender's security interest. Pollock v. General Finance Corp., 535 F2d 295, 299 (5th Cir. 1976). While that section of our Uniform Commercial Code was amended in 1978 after Pollock was decided, the revision "retains the former restriction on after-acquired consumer goods (except accessions) to those acquired within ten days after the secured party gives value." Ga. Revisers' Comments, Code Ann. § 109A-9—204 (Ga. L. 1978, pp. 1081, 1098). Thus under both the present and former sections, "[n]o security interest attaches under an after-acquired property clause to consumer goods *other than accessions* (section 109A-9—314) when given as additional security unless the debtor acquires rights in them within 10 days after the secured party gives value." Code Ann. § 109A-9—204 (2). (Emphasis supplied.)

In Pollock, the after-acquired goods involved were household articles, not accessions, and the appeal was from a decision of the United States District Court for the Northern District of Georgia construing § 226.8 (b) (5) of Regulation Z to require lenders to fully explain the 10-day limitation set forth by the Georgia UCC. The disclosure statement there provided that the security agreement "may cover after-acquired property" and the Court of Appeals held that "the disclosure statement, although perhaps not false, fails to make a complete disclosure concerning the security interest retained in after-acquired goods, and therefore it did not comply with the further requirement of the regulation that notice that after-acquired property will be subject to the security interest 'shall be clearly set forth in conjunction with the description or identification of the type of the security interest held . . . ' We believe that this portion of the regulation requires a lender to explain the 10 day limitation of UCC 9-204 (4) (b) [present § 109A-9—204 (2)] so that the borrower is informed that any consumer goods that he may acquire within 10 days of the loan transaction are subject to the security interest and that

any consumer goods acquired after that date are not. Since the lender failed to disclose the nature of the security interest retained in after-acquired property, we determine that General Finance violated § 226.8 (b) (5)." Pollock, supra, at p. 299. See also Tinsman v. Moline Beneficial Finance Co., 531 F2d 815 (7th Cir. 1976), reaching the same conclusion, and cases cited.

Before these cases become pertinent here, however, we must first determine whether the "accessories, parts and equipment now or hereafter affixed thereto or used in connection" with the secured automobile as contemplated by the security agreement are limited by definition to "accessions" and thereby exempt from the 10-day disclosure under Code § 109A-9—204 (2).

The Uniform Commercial Code defines "accessions" as "goods which . . . are installed in or affixed to other goods . . . ." Code Ann. § 109A-9—314 (1). The Trust Company argues that tires, spark plugs, shock absorbers and other parts which become worn and must be replaced during the life of an average automobile would be accessions under the UCC definition. If so, even such non-essentials as stereo speakers or tape decks if "installed in or affixed to" the automobile might qualify. While this is a question of first impression in this court, other courts in considering whether placement of certain goods upon vehicles changed their status so that they became "automobile accessories" for various tax purposes have generally been more restrictive. E.g., United States v. King Trailer Co., 350 F2d 947 (9th Cir. 1965) ("pickup coaches" designed to convert pickup trucks to campers do not fall within the classification of "automobile truck bodies" or "automobile accessories"); Smith v. McDonald, 214 F2d 920 (3rd Cir. 1954) (electric signs attached to roof by suction cups not "automobile accessories"); but see *Wooden v. Michigan Nat. Bank,* 117 Ga. App. 852 (162 SE2d 222) (1968) (dicta indicating that furnaces installed in mobile homes would be "accessions" under the UCC); Aran v. United States, 259 F2d 757 (9th Cir. 1958) (baby bottle warmer which could only be used by being plugged into an automobile cigarette lighter was an "automobile accessory"); See generally, Annot., 43 ALR2d 815 (1955).

The security description here also specifically

included goods to be used "in connection with" the automobile and this, in our view, causes it to transcend the UCC contemplation of "accessions." To hold otherwise would be contrary to prior established Georgia law declaring accessions to be goods of such a nature as to form an "integral part" of the automobile "and are so attached to it, that [they] are one and the same thing under the accession rule." *Passieu v. B. F. Goodrich Co.,* 58 Ga. App. 691, 692 (199 SE 775) (1938); *Ivey's Inc. v. Southern Auto Stores,* 59 Ga. App. 336 (1 SE2d 35) (1939) (holding tires and inner tubes not to be accessions as against the conditional seller of the goods under a duly recorded contract retaining title).

This view is also in accord with federal court interpretations of the UCC, which have held that "[n]either the term 'replacements' nor the term 'additions' can be construed as necessarily referring only to accessions or proceeds." Jacklitch v. Redstone Fed. Credit Union, 463 FSupp. 1134, 1137 (N. D. Ala. 1979); Gilbert v. Southern Discount Co., No. 74-1417A (N. D. Ga., filed July 23, 1975). Nevertheless, as noted in the Gilbert case, supra, the fact that the clause may be construed as referring to accessions rather than after-acquired property does not compel a finding that the language is not confusing or misleading to the consumer. While arguably an "addition" may be sufficiently affixed to the described secured property to be considered an "accession" as defined by the UCC, if the lender had intended to limit its security interest to accessions, it could have used this exact term. And the clause must be construed most strictly against the drafter since "[t]he Truth in Lending Act reflects a transition in congressional policy from a philosophy of let the buyer beware to one of let the seller disclose. By erecting a barrier between the seller and the prospective purchaser in the form of hard facts, Congress expressly sought 'to . . . avoid the uninformed use of credit.' 15 USC § 1601 [15 USCA § 1601]." Mourning v. Family Publications Service, 411 U. S. 356, 377 (93 SC 1652, 36 LE2d 318, 334) (1973). We, therefore, conclude that the Trust Company failed to fully disclose the nature of the security interest retained in after-acquired property other than accessions by·not

explaining the 10 day limitation of Code Ann. § 109-9—204 (2), thereby violating § 226.8 (b) (5) of Regulation Z of the Federal Consumer Protection Act.

2. Glenn also asserts that a violation of Regulation Z occurred with the assignment of the homestead exemption in the note and security agreement. In the note, seven paragraphs below the security disclosure paragraph the following clause appears: "Undersigned transfers, assigns and conveys to the Holder a sufficient amount of homestead and exemption which undersigned or undersigned's family may have under or by virtue of the Constitution or laws of Georgia or any other State of the United States as against Liabilities and to pay them. In case of bankruptcy, undersigned authorizes and directs the Trustee to deliver to Holder a sufficient amount of property or money claimed as exempt to pay Liabilities and the Holder is appointed attorney in fact for undersigned to claim any and all homestead exemptions allowed by law."

Citing Elzea v. Nat. Bank of Ga., 570 F2d 1248 (5th Cir. 1978) and Brown v. Termplan, Inc., 459 FSupp. 160 (N. D. Ga. 1978), Glenn argues that this assignment was a security interest which must be disclosed at the top of the note pursuant to § 226.8 (b) (5) rather than at the bottom. In Elzea the paragraph assigning the homestead exemption is identical to that used here. However, in addition, the lender's disclosure statement recited that " 'This note is also secured by an assignment of [Elzea's] homestead exemption,' " and the court held that the disclosure was adequate. Elzea, supra, at 1249. The disclosure statement here is silent as to a security interest in Glenn's homestead exemption. We adopt the rationale of Elzea and hold that the assignment of the homestead exemption creates a "security interest held or to be retained or acquired by the creditor in connection with the extension of credit" which is required to be described and disclosed. 15 USCA § 1639 (a) (8); 12 CFR § 226.2 (gg); Elzea v. Nat. Bank of Ga., supra at 1249.

This court has previously agreed with the federal courts that the technical and complex requirements of the Truth-in-Lending Act and the Federal Reserve Board Regulations promulgated pursuant thereto demand strict

enforcement: " 'The requirements of [Regulation Z] are quite technical, but Congress did not intend creditors to escape liability where only technical violations were involved . . . "Indeed, the technical requirements of the Act must be strictly enforced if the goal of standardization of terms, which is a requisite if consumers are to be able to make meaningful comparison of available credit alternatives, is to be achieved." ' "*Good Housekeeping Shop v. Hines,* 146 Ga. App. 713, 714 (2) (247 SE2d 142) (1978), quoting Pennino v. Morris Kirschman & Co., 526 F2d 367, 370 (5th Cir. 1976) and cits.

Regulation Z, § 226.8 (b) (5) requires a description or identification of the type of *any* security interest to be retained by the creditor *in the disclosure statement* or a reference to a separate pledge agreement where a clear identification cannot properly be made in the disclosure statement. § 226.8 (a) states that "[a]*ll of the disclosures shall be made together* on either . . . [t]he note or other instrument evidencing the obligation on the same side of the page and above the place for the customer's signature; or . . . [o]ne side of a separate statement which identifies the transaction . . . " (Emphasis supplied.)

Here although all of the disclosures were made on one side of the page of the note and above the customer's signature, they were not all made together. Thus we must conclude that there was a failure to comply with the technical requirements of the Truth-in-Lending Act. See *Thomas v. Universal Guardian Corp.,* 144 Ga. App. 869 (243 SE2d 101) (1978). The statutory purpose of the Act is to "assure a meaningful disclosure of credit terms . . ." 15 USCA § 1601 (a). Therefore, "[a] creditor should evaluate its credit terms so as to come within the spirit of the law as well as its letter. Otherwise, as here, the creditor may find himself outside of both." Brown v. Termplan, Inc. of Ga., 459 FSupp. 160, 163, supra. Accord, Manning v. Princeton Consumer Discount Co., 533 F2d 102 (3rd Cir. 1976); Ninth Liberty Loan Corp. v. Hardy, 368 NE2d 971 (Ill. 1977) and cits.

3. Glenn contends a third Truth-in-Lending violation also exists because of Trust Company's failure to properly disclose prepaid credit charges. The trial judge found that "in the area of the finance charge the [lender]

has placed three items, these are a charge of $15.00 for single interest insurance, a charge of $7.75 for a credit investigation fee, and the finance charge which was $887.90. The finance charge was one item, i. e., interest."

However, Regulation Z, § 226.4 (a) (6) and (7) states that "(a) Except as otherwise provided in this section, the amount of the finance charge in connection with any transaction shall be determined as the sum of all charges, payable directly or indirectly by the customer, and imposed directly or indirectly by the creditor as an incident to or as a condition of the extension of credit . . . including any of the following types of charges: . . . (6) Charges or premiums for insurance, written in connection with any credit transaction, against loss of or damage to property or against liability arising out of the ownership or use of property, unless a clear, conspicuous, and specific statement in writing is furnished by the creditor to the customer setting forth the cost of the insurance if obtained from or through the creditor and stating that the customer may choose the person through which the insurance is to be obtained. (7) Premium or other charge for any other guarantee or insurance protecting the creditor against the customer's default or other credit loss."

The insurer may waive all rights of subrogation against the customer in a single interest policy against all such loss or damage. "However, if the insurer does not so waive subrogation in such policy of insurance, *the charges or premiums shall be included in the finance charge.*" 12 CFR § 226.404 (b). (Emphasis supplied.)

Furthermore, in addition to the terms required to be disclosed by Regulation Z, § 226.8 (b), as previously discussed herein, § 226.8 (d) (1) and (3) require disclosure of both the amount of credit "which will be paid to the customer or for his account or to another person on his behalf, including all charges, individually itemized, which are included in the amount of credit extended but which are not part of the finance charge, using the term 'amount financed,' " and "the total amount of the finance charge, using the term 'finance charge,' *and where the total charge consists of two or more types of charges, a description of the amount of each type.*" (Emphasis supplied.)

The judgment of the trial court expressly found that the $15 single insurance premium was not included in the finance charge and that the loan officer did not explain to Glenn what single interest insurance was. There is nothing in the note itself or the record to show that subrogation was waived.

Sections 1 through 9 of the note list interest, insurance and other charges plus the amount of the loan for a total of payments. Section 2 refers to automobile insurance but no payments are indicated thereunder. Credit life and disability insurance were specifically declined and so marked. Written into the margins on either side of Section 8, which lists the finance charge as $887.90, are the additions: "Single interest insurance $15.00" and "$7.75 Credit Investigation fee." Section 3 in which "Other Charges" are to be specified is marked "0." No item is disclosed or described as interest. Underneath these sections the note declares that "Property insurance is required and may be obtained from a person of your choice acceptable to Lender." Nowhere in the note is the borrower advised or placed on notice of the fact that single interest insurance is automobile property insurance. Compare Reed v. Washington Trailer Sales, 393 FSupp. 886 (M. D. Tenn. 1974). The note also shows the amount of the loan to be $4,170.75, an annual percentage rate of 13.25% and the total payments to be $5,081.40.

Under Regulation Z, however, either the $15 single interest insurance and the $7.75 credit investigation fee must be combined with the $887.90, which the court found to be interest, for a finance charge of $910.65; or if these non-interest charges are not clearly described as part of the finance charge they must be individually itemized and included in the amount of credit extended using the term "amount financed." Regulation Z, § 226.8 (d) (1) and (3), supra. But even though it is obvious that in order to obtain total payments of $5,081.40 the $22.75 in undesignated prepaid charges must be included in either the finance charge or the amount financed, neither was done.

The general rule under Regulation Z is that "the amount of the finance charge . . . shall be determined as the sum of all charges" paid by the customer as an

"incident to or as a condition of the extension of credit . . ." including credit investigation fees and insurance protecting·the creditor against the customer's default or other property loss. 12 CFR § 226.4 (a) (4) and (7). The disclosures required to be given "shall be made clearly, conspicuously [and] in meaningful sequence . . ." 12 CFR § 226.6 (a). As previously noted, § 226.8 (d) (3) requires both the disclosure of the amount of each component of the finance charge as well as a description of the type of each component. The disclosures here were not made clearly or conspicuously or in meaningful sequence and they were not made a part of the finance charge. Although the trial judge found the $887.90 was interest, it was not so designated, and the insurance charge was not explained. Moreover, since the total finance charge is $910.65, the annual percentage rate given in the note is also incorrect and in violation of § 226.8 (b) (2), which states that "[a] creditor may not divide an extension of credit into two or more transactions to avoid the disclosure of an annual percentage rate . . . " We conclude that the instrument prepared by Trust Company did not properly disclose the prepaid credit charges.

4. For all of the reasons enunciated in Divisions 1, 2 and 3 of this opinion, we hold that the trial court erred in concluding as a matter of law that there was no violation of the Federal Consumer Credit Protection Act.

5. While the case must be reversed because of violations of the·Truth-in-Lending Act entitling Glenn to recover the statutory damages, "[t]he enumeration of error based upon the denial of summary judgment is based on a faulty premise. After verdict and judgment, it is too late to review a judgment denying a summary judgment for that judgment becomes moot when the court reviews evidence upon the trial of the case. [Cits.] This enumeration is without merit." *Phillips v. Abel,* 141 Ga. App. 291 (1) (233 SE2d 384) (1977); *Crestlawn Memorial Park v. Scott,* 146 Ga. App. 715, 718 (4) (247 SE2d 175) (1978).

*Judgment reversed. Deen, C. J., and Shulman, J., concur.*

Submitted September 5, 1979 — Decided November 14, 1979.

*James A. Elkins, Jr.*, for appellant.
*Thomas L. Thompson, Jr.*, for appellee.