WALKER BANK & TRUST COMPANY, a Utah Banking corporation, nka First Interstate Bank of Utah, Plaintiff and Respondent,

v.

Betty JONES, Defendant and Appellant.

WALKER BANK & TRUST COMPANY, a Utah Banking corporation, Plaintiff and Respondent,

v.

Gloria HARLAN, Defendant and Appellant.

Nos. 18110, 18111.

Supreme Court of Utah.

Sept. 8, 1983.

Ron Nehring, Bruce Plenk, Salt Lake City, for defendants and appellants.

Roy A. Williams, Suzanne West, Salt Lake City, for plaintiff and respondent.

HALL, Chief Justice:

At issue in these consolidated cases is the liability of defendants to plaintiff Walker Bank for expenses allegedly incurred by defendants' separated spouses upon credit card accounts established by the plaintiff bank in the names of the defendants. Defendants appeal from adverse summary

judgment orders on the grounds that their rights under the Federal Truth in Lending Act[1] were violated.

## A. Defendant Betty Jones

In 1977, Defendant Jones established VISA and Master Charge accounts with plaintiff Walker Bank (hereinafter "Bank"). Upon her request, credit cards were issued on those accounts to herself and her husband in each of their names.

On or about November 11, 1977, defendant Jones informed the Bank, by two separate letters, that she would no longer honor charges made by her husband on the two accounts, whereupon the Bank immediately revoked both accounts and requested the return of the credit cards.[2] Despite numerous notices of revocation and requests for surrender of the cards, both defendant Jones and her husband retained their cards and continued to make charges against the accounts.

It was not until March 9, 1978, that defendant Jones finally relinquished her credit cards to the Bank, and then only after a persuasive visit to her place of employment by a Bank employee. At the time she surrendered her cards, the balance owing on the combined accounts (VISA and Master Charge) was $2,685.70. Her refusal to pay this balance prompted the Bank's institution of this suit to recover the same.

## B. Defendant Gloria Harlan

In July, 1979, defendant Harlan, who was prior to that time a VISA cardholder at plaintiff Bank, requested that her husband, John Harlan, be added to the account as an authorized user. The Bank honored this request and issued a card to Mr. Harlan. Shortly thereafter, at some point between July and the end of 1979, the Harlans separated and defendant (Mrs.) Harlan informed the Bank by letter that she either wanted the account closed or wanted the Bank to deny further extensions of credit to her husband.

Notwithstanding the explicit requirement in the account agreement that all outstanding credit cards be returned to the Bank in order to close the account, defendant Harlan did not tender either her card or her husband's at the time she made the aforementioned request. As to her card, she informed the Bank that she could not return it because it had been destroyed in the Bank's automated teller. Notwithstanding, however, she returned the card to the Bank some three months later (March, 1980).

In the interim period, i.e., after defendant's correspondence with the Bank regarding the exclusion of her husband from her account and prior to the relinquishment of her card, several charges were made (purportedly by Mr. Harlan) on the account for which the Bank now seeks recovery. The Bank has sued only Mrs. Harlan, as owner of the account.

Defendants' sole contention on appeal is that the Federal Truth in Lending Act (hereinafter "TILA") limits their liability, for the unauthorized use of the credit cards by their husbands, to a maximum of $50. The specific section of the Act upon which this contention rests is 15 U.S.C. § 1643. In pertinent part, it reads thus:

(a) A cardholder shall be liable for the unauthorized use of a credit card only if the card is an accepted credit card, the liability is not in excess of $50.00 . . . and the unauthorized use occurs before the cardholder has notified the issuer that an unauthorized use of the credit card has occurred or may occur as the result of loss, theft, or otherwise.

\* \* \* \* \* \*

(d) Except as provided in this section, a cardholder incurs no liability from the unauthorized use of a credit card.

The Bank's rejoinder is that § 1643 does not apply, inasmuch as defendants' husbands' use of the credit cards was at no time "unauthorized use" within the meaning of the statute. Whether such use was

---

**1.** 15 U.S.C. §§ 1601, et seq.

**2.** By the terms of the credit card account agreement, an account can be closed by returning to the Bank all outstanding credit cards.

"unauthorized," as that term is contemplated by the statute, is the pivotal question in this case.

The term "unauthorized use" is defined in 15 U.S.C. § 1602(*o*) (1974) as:

> [U]se of a credit card by a person other than the cardholder who does not have actual, implied, or apparent authority for such use and from which the cardholder receives no benefit.

A "cardholder" is described in 15 U.S.C. § 1602(m) as:

> [A]ny person to whom a credit card is issued or any person who has agreed with the card-issuer to pay obligations arising from the issuance of a credit card to another person.

Defendants contend that they alone occupied the status of "cardholder," by reason of their request to the bank that credit cards be issued to their husbands and their assumption of liability therefor.[3] Accordingly, they maintain that their husbands were no more than authorized users of defendants' accounts.

Defendants' further aver that the effect of their notification to the Bank stating that they would no longer be responsible for charges made against their accounts by their husbands was to render any subsequent use (by their husbands) of the cards unauthorized. This notification, defendants maintain, was all that was necessary to revoke the authority they had once created in their husbands and thereby invoke the § 1643 limitations on cardholder liability.

The Bank's position is that unauthorized use within the meaning of § 1643 is precisely what the statutory definition (§ 1602(*o*) *supra*) says it is, to wit: "[U]se ... by a person ... who does not have actual, implied, or apparent authority ...," and that notification to the card issuer has no bearing whatsoever on whether the use is unauthorized, so as to entitle a cardholder to the statutory limitation of liability. We agree with this position.

Where § 1643 governs, the liability of the cardholder for unauthorized charges is limited to $50 regardless of any notification to the card issuer. Notification, if given prior to the unauthorized charges, serves only to eliminate the $50 liability and not, as defendants argue, to render a use unauthorized. Unless and until the unauthorized nature of the use has been established, the notification provision, as well as the statute itself, is irrelevant and ineffectual.

The language of the statute defining unauthorized use (§ 1602(*o*) *supra*) is clear and unambiguous. It excludes from the category of unauthorized users, any person who has "actual, implied, or apparent authority."

The Bank maintains that defendants' husbands clearly had "apparent" authority to use the cards, inasmuch as their signatures were the same as the signatures on the cards, and their names, the same as those imprinted upon the cards.[4] Accordingly, it contends that no unauthorized use was made of the cards, and that defendants therefore cannot invoke the limitations on liability provided by the TILA.

Again, we find the Bank's position to be meritorious. Apparent authority exists:

> [W]here a person has created such an appearance of things that it causes a third party reasonably and prudently to believe that a second party has the power to act on behalf of the first person ....[5]

As previously pointed out, at defendants' request their husbands were issued cards bearing the husbands' own names and signatures. These cards were, therefore, a representation to the merchants (third parties) to whom they were presented that defendants' husbands (second parties—cardbearers) were authorized to make charges upon the defendants' (first parties—card-

---

3. In support of this position, defendants cite: 15 U.S.C. § 1642, and FRB Official Staff Interpretation, No. FC–0070, May 11, 1977, 42 Fed. Reg. 25,491 (1977).

4. *See Martin v. American Express, Inc.*, Ala. Civ.App., 361 So.2d 597 (1978).

5. *Wynn v. McMahon Ford Co.*, Mo.App., 414 S.W.2d 330, 336 (1967).

holders) accounts. This apparent authority conferred upon defendants' husbands by reason of the credit cards thus precluded the application of the TILA.

█ In view of our determination that the TILA has no application to the present case, we hold that liability for defendants' husbands' use of the cards is governed by their contracts with the Bank. The contractual agreements between defendants and the Bank provided clearly and unequivocally that *all* cards issued upon the accounts be returned to the Bank in order to terminate defendants' liability. Accordingly, defendants' refusal to relinquish either their cards or their husbands', at the time they notified the Bank that they no longer accepted liability for their husbands' charges, justified the Bank's disregard of that notification and refusal to terminate defendants' liability at that time.

The dissent expresses concern that the decision of the Court imposes an unreasonable burden on the cardholder. We disagree because in our opinion justice is better served by placing the responsibility for the credit escapades of an errant spouse (or son, daughter, mother, father, etc.) on the cardholder rather than the Bank. The cardholder is not left powerless to protect against misuse of the card. He or she need only surrender the cards and close the account, just as the defendants in the instant case were requested by the Bank to do.

Affirmed. No costs awarded.

OAKS, J., and J. ROBERT BULLOCK, District Judge, concur.

DURHAM, Justice (dissenting):

I dissent from the majority opinion because I believe that the federal statute and the specific cardholder agreements in question relieve the defendants of liability for the unauthorized use of their credit cards by their spouses.

The pertinent portions of § 1643 of the Federal Truth in Lending Act (hereafter "TILA") are set forth in the majority opinion. *See* 15 U.S.C.A. § 1643 (1982). Section 1643(a) of the TILA limits a cardhold-

er's liability to a maximum of $50 for any unauthorized use of a credit card which occurs *before* the cardholder has notified the card issuer of the possibility of any unauthorized use. More importantly, however, § 1643(d) relieves a cardholder of "all" liability for any unauthorized use which occurs *after* the cardholder has notified the card issuer of the possibility of an unauthorized use. The cardholder agreements in the present case contain provisions which implement, and are virtually identical to, § 1643:

> Unauthorized Use. Cardholder is responsible for all authorized transactions made and credit extended by use of Cardholder's [credit card], regardless of credit limits and the party using them. Cardholder may be liable for the unauthorized use of the cards where the cards are used by a person other than the Cardholder who does not have actual, implied or apparent authority for such use and from which the Cardholder receives no benefit. However, *Cardholder will not be liable for the unauthorized use of a [credit card] which occurs after written or oral notice of the loss, theft or possible unauthorized use is given* either verbally at any office of Bank or in writing . . . . Liability for unauthorized use shall in no event exceed $50.00 on each account established.

(Emphasis added.) Thus, as recognized by the majority opinion, the resolution of this case focuses on whether the defendants' husbands' use of the defendants' credit cards constitutes an "unauthorized use" within the meaning of the statute and the cardholder agreements.

The term "unauthorized use" is defined as follows:

> "[U]nauthorized use" . . . means use of a credit card by a person . . . who does not have actual, implied, or apparent authority for such use and from which the cardholder receives no benefit.

15 U.S.C.A. § 1602(*o*) (1982). Thus, the pivotal issue in this case is whether the defendants' notification to the Bank was sufficient to revoke the defendants' husbands' "actual, implied, or apparent author-

ity" to use the credit cards, thereby rendering the husbands' use unauthorized. The majority opinion responds in the negative by contending that the defendants' husbands were clothed with apparent authority because they carried credit cards imprinted with the husbands' names and bearing the husbands' signatures. The majority opinion holds that, despite notification to the Bank by the defendants that all authority has been expressly revoked, this apparent authority continues to exist until the defendants obtain the cards from their estranged husbands and return them to the Bank. I disagree with that holding for three reasons.

First, the result of the majority opinion runs counter to the purpose of § 1643 of the TILA, which has been described as follows:

> The federal credit card statute reflects a policy decision that it is preferable for the issuer to bear fraud losses arising from credit card use.
>
> ... [I]ssuers are in a better position to control the occurrence of these losses. They not only select the merchants who may accept the card and the holders who may use it, but also design the security systems for card distribution, user identification, and loss notification. Hence, *the statutory choice of issuer liability assures that the problem of credit card loss is the responsibility of the party most likely to take efficient steps in its resolution.*

Weistart, *Consumer Protection in the Credit Card Industry: Federal Legislative Controls,* 70 Mich.L.Rev. 1475, 1509–10 (1972) (citations omitted) (emphasis added). *Cf. First National Bank of Mobile v. Roddenberry,* 701 F.2d 927 (11th Cir.1983) (stating that, by issuing a credit card, a bank assumes the risk of nonpayment and that only the bank can decide when and if credit will be revoked). Under the present circumstances, I acknowledge that the burden or risk of liability should initially fall on the cardholder because use of the credit card by

a spouse is, and remains, authorized until notice is given to the card issuer that the authority to use the credit card is revoked. However, once the cardholder notifies the card issuer of the revocation of that authority, it is clear that the card issuer is in the best position to protect itself, the cardholder and third parties. The card issuer can protect both itself and the cardholder by refusing to pay any charges on the account, and it can protect third parties by listing the credit card in the regional warning bulletins. *See* Weistart, *supra; Standard Oil Co. v. State Neon Co.,* 120 Ga.App. 660, 171 S.E.2d 777 (1969). The issuer need only terminate the existing account, transfer all existing charges to a new number, and issue a new card to the cardholder.

In circumstances similar to the present case, the Supreme Court of New York stated:

> It is interesting to note, parenthetically, that under the provisions above quoted, defendant [cardholder] would not be liable for purchases made after notice of loss or theft of the card and if he was in fact unable to obtain the card from his estranged wife, the result was not greatly different. Indeed the plaintiff's [card issuer's] situation was no worse than in the case of a loss of theft but probably considerably better since it knew the whereabouts of the card and of the holder.

*Socony Mobile Oil Co. v. Greif,* 10 A.D.2d 522, 197 N.Y.S.2d 522, 523–24 (1960) (decided prior to the enactment of § 1643 of the TILA and based on the language of the particular cardholder agreement). Thus, in conformance with the purpose of § 1643 of the TILA, the better holding in this case, as a policy matter, is that, after notification to the card issuer, the cardholder should be relieved of all liability for the unauthorized use of the credit card by an estranged spouse.[1]

Second, the language of § 1643 and the law of agency require that the defendants be relieved of liability. As the majority

---

1. It is interesting to point out that the husbands' use of the defendants' credit cards in the present case may in fact violate one of our criminal statutes. *See* U.C.A., 1953, § 76–6–506.2 (regarding fraudulent use of a credit card).

opinion recognizes, state law determines the question of whether the defendants' husbands are clothed with "apparent authority." *See, e.g.,* FRB Letter of July 23, 1974, No. 822, by J. Kluckman, Chief, Truth-in-Lending Section (excerpted in Consumer Credit Guide (CCH) ¶ 31,144 (October 8, 1974)). Under Utah law, a husband or wife may terminate an agency created in the spouse in the same manner as any other agency. *See* U.C.A., 1953, § 30–2–8. The majority opinion holds that the defendants' husbands' use was authorized because the husbands had "apparent authority." This is apparently a reference to the relationship between the husband and third-party merchants who rely on the husband's possession of a credit card with his name and matching signature on it. It cannot refer to the existence of apparent authority vis-a-vis the Bank, because the Bank has been *expressly notified* of the revocation of all authority. I fail to see why the existence of "apparent authority" as to third-party merchants should govern the liability of a cardholder whose spouse "steals" a card in the context of marital difficulties, any more than it would govern in the case of a cardholder whose card is stolen before delivery and bears a "matching signature" forged thereon by a thief.

It is well recognized that apparent authority exists only to the extent that the *principal* represents to a third person that another is one's agent. *See, e.g.,* Restatement (Second) of Agency § 8 & comments (1958). In the present case, with respect to the Bank, the husbands' authority, actual, implied and apparent, was specifically terminated by the defendants (the principals) when the Bank was notified that the husbands' authority to use the defendants' credit cards was revoked. *See, e.g., id.* §§ 124A, 125 & 130. Thus, after notification, the husbands' use was unauthorized and both § 1643 and the provisions of the cardholder agreements relieved the defendants of all liability for charges incurred by their husbands subsequent to that notification. *See, e.g., In re Shell Oil Co.,* 95 F.T.C. 357 (1980); *Socony Mobile Oil Co. v. Greif,*

*supra. Accord Neiman-Marcus Co. v. Viser,* La., 140 So.2d 762 (1962).

In the *Shell Oil* case, *supra,* several cardholders petitioned the Federal Trade Commission (hereafter "FTC"), which is vested with authority to enforce both the Federal Trade Commission Act and the TILA, for relief from certain practices of the Shell Oil Co. which were allegedly in violation of those Acts. Shell Oil Co. issued credit cards to cardholders to enable them to purchase goods and services at Shell's service stations. Some cardholders authorized third persons to use their credit cards. In certain instances, several cardholders notified Shell Oil Co. that such previously authorized users were no longer authorized. Shell Oil Co. responded by informing the cardholders that they would remain liable for charges incurred by the third persons until the credit cards used by the third persons were returned. The FTC ordered Shell Oil Co. to forthwith cease and desist from:

1. *Failing to limit the liability of a cardholder* for use of a credit card by a third person, in those cases where such third person has been given authorization by the cardholder to use such credit card, *to the amount* of money, property, labor, or services *obtained by use prior to notification* ... by the cardholder that such use is no longer authorized ... [and]

2. Informing a cardholder that [the card issuer] considers the cardholder liable for use of a credit card by a third person which occurs after the cardholder notifies [the card issuer] that such use is no longer authorized.

*In re Shell Oil Co., supra,* at 359–60 (emphasis added). Thus, under § 1643 as interpreted by the FTC in the *Shell Oil* case, the defendants' liability in the present case is limited to the charges incurred by their husbands prior to notification.

The majority opinion sanctions the Bank's refusal to terminate the defendants' liability based on the majority opinion's interpretation that the cardholder agreements require "clearly and unequivocally that *all* cards issued upon the accounts be returned to the Bank in order to terminate defend-

ants' liability." To the contrary, the cardholder agreements do not mandate the return of the credit cards as a condition precedent to termination of *liability.* The cardholder agreements provide that "Cardholder may terminate this *Agreement* at any time by returning the cards issued under this Agreement to the Bank." (Emphasis added.) This provision deals with termination of the "account," not termination of liability for unauthorized use. In fact, like § 1643, the relevant portions of the cardholder agreements, quoted above, provide specifically that the cardholder is not liable for charges incurred *after* notice of the possible unauthorized use is given to the Bank. Contrary to the majority opinion's suggestion, there are no provisions in the cardholder agreements that require the return of the credit cards to the Bank as a prerequisite to relieving the defendants of "liability" for the unauthorized use of their credit cards.

Finally, the majority opinion ignores the impracticality of imposing the burden on a cardholder of obtaining a credit card from an estranged spouse in order to return it to the Bank. It is unrealistic to think that estranged spouses will be cooperative. Moreover, it is extremely unwise to arm one spouse with a weapon which permits virtually unlimited spending at the expense of the other. As is illustrated by the facts of these cases, where the whereabouts of the unauthorized spouse are unknown, the cardholder may be powerless to acquire possession of his or her card and return it to the Bank, which, according to the majority opinion, is the only way to limit liability. One result of the majority opinion will surely be to encourage the "theft" by divorcing spouses of credit cards they were authorized to use during the marriage and the liberal use of those cards at the other spouse's expense.

In conclusion, I dissent from the majority opinion because (1) it runs counter to the language and purpose of § 1643 of the TILA and the language of the cardholder agreements, (2) it violates principles of the law of agency, and (3) it imposes an unreasonable burden on cardholder spouses and

sets the stage for abusive use of credit cards by estranged spouses. I believe that § 1643 of the TILA and the provisions of the cardholder agreements relieve the defendants from liability for the unauthorized charges incurred by their husbands subsequent to the notification given to the Bank.

HOWE, J., concurs in the dissenting opinion of DURHAM, J.

STEWART, J., having disqualified himself, does not participate herein.

BULLOCK, District Judge, sat.